**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 14-5138**

_____

**IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**
_____

SHELBY COUNTY, ALABAMA,

Plaintiff – Appellant,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,

Defendants – Appellees.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**BRIEF FOR APPELLANT**

_____

Frank C. Ellis
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL 35051
TEL: (205) 669-6783

Bert W. Rein*
Brendan J. Morrissey
J. Michael Connolly
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
TEL: (202) 719-7000
E-MAIL: brein@wileyrein.com

Dated: October 29, 2014        * *Counsel of Record*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellant Shelby County, Alabama, certifies as follows:

**(A)  Parties and Amici**

Shelby County, Alabama, was the Plaintiff in the court below and is the Appellant in this Court.

Eric H. Holder, Jr., Attorney General of the United States, was the Defendant in the court below and is an Appellee in this Court.

Earl Cunningham, Harry Jones, Albert Jones, Ernest Montgomery, Anthony Vines, William Walker, Bobby Pierson, Willie Goldsmith, Sr., Mary Paxton-Lee, Kenneth Dukes, Alabama State Conference of the National Association for the Advancement of Colored People, and Bobby Lee Harris were Defendant-Intervenors in the court below and are Appellees in this Court.

The Constitutional Accountability Center participated as amicus curiae in the court below in a prior stage of this case, and is not a party in this Court.

**(B)  Rulings Under Review**

The ruling under review is an Order denying Shelby County's motion for attorney's fees. The Order was issued on May 28, 2014 by District Judge John D. Bates and entered as Docket Number 107 in the court below.  A Memorandum Opinion explaining the Order was also issued on May 28, 2014 and was entered as

Docket Number 108. The opinion has not yet been published in the Federal Supplement, but it is available on Westlaw at 2014 WL 2200898.

**(C)    Related Cases**

This case was previously before this Court, *see Shelby County, Alabama v. Holder*, No. 11-5256, 679 F.3d 848 (D.C. Cir. 2012), and before the Supreme Court of the United States, *see Shelby County, Alabama v. Holder*, No. 12-96, 133 S. Ct. 2612 (2013). There are no related cases currently pending in this Court or in any other court.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... ii

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY................................................................................ xii

STATEMENT OF JURISDICTION................................................1

STATEMENT OF THE ISSUES..................................................2

STATUTES AND REGULATIONS .............................................2

STATEMENT OF FACTS ..........................................................2

SUMMARY OF THE ARGUMENT ..........................................10

ARGUMENT .............................................................................15

I.      STANDARD OF REVIEW ..............................................15

II.     THE DISTRICT COURT ERRED IN NOT APPLYING THE
        *PIGGIE PARK* STANDARD. .........................................16

        A.      The *Piggie Park* Standard Must Guide The District Court's
                Discretion Because Congress Specifically Authorized Shelby
                County's Successful Pursuit Of State Voting Autonomy. .................16

                1.      Section 14(b) Of The VRA Provided Jurisdiction For
                        Shelby County's Action..........................................16

                2.      Where A Party Prevails In Establishing Rights In A
                        Section 14(b) Action, Supreme Court And D.C. Circuit
                        Precedent Require Application Of The *Piggie Park*
                        Standard. ..............................................................17

                3.      Awarding Fees To Shelby County Against The
                        Government Would Further The Incentives Congress
                        Created Through Section 14(e) And Properly Tax The
                        Government For Enforcing An Unconstitutional Statute. .......24

        B.      The District Court's "Purposive" Analysis Is Not Supported By
                The Case Law And Misconstrues Section 14(e). ..............................31

                1.      The District Court's Use Of A "Purposive" Analysis Is
                        Not Supported By The Cases It Cites. .....................................31

2.    The District Court Badly Misconstrued Congress's Purposes In Enacting Section 14(e). ........................................35

3.    The District Court Misunderstood Shelby County's Motivations For Bringing This Action, Which Tainted Its "Purposive" Analysis. ..............................................................42

III.    APPLICATION OF *PIGGIE PARK* MUST RESULT IN AN AWARD OF FEES TO SHELBY COUNTY. ...........................................45

CONCLUSION ......................................................................................46

CERTIFICATE OF COMPLIANCE .....................................................48

CERTIFICATE OF SERVICE ..............................................................49

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Adirondack Medical Center v. Sebelius*,
   740 F.3d 692 (D.C. Cir. 2014) ...........................................................38

*\*Allen v. State Board of Elections*,
   393 U.S. 544 (1969) ................................................................... 17, 36

*Alyeska Pipeline Service Co. v. Wilderness Society*,
   421 U.S. 240 (1975) .........................................................................19

*Carnegie v. Household International, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ...........................................................27

*Castro County, Texas v. Crispin*,
   101 F.3d 121 (D.C. Cir. 1996) .......................................................7, 26

*\*Christiansburg Garment Co. v. EEOC*,
   434 U.S. 412 (1978) ...................................... 9, 10, 12, 19, 20, 27, 32

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) .........................................................................43

*Commissioners Court of Medina County, Texas v. United States*,
   683 F.2d 435 (D.C. Cir. 1982) ............................... 7, 22, 23,  24, 32, 45

*Conservation Force v. Salazar*,
   699 F.3d 538 (D.C. Cir. 2012) ..........................................................15

*Coyote v. Roberts*,
   502 F. Supp. 1342 (D.R.I. 1980) ......................................................33

*Davis v. Perry*,
   991 F. Supp. 2d 809 (W.D. Tex. 2014) ............................................29

*Donnell v. United States*,
   682 F.2d 240 (D.C. Cir. 1982) ....................................................7, 23, 32, 45

\* Authorities upon which we chiefly rely are marked with asterisks.

*Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund*,
    799 F.2d 45 (3d Cir. 1986) ...........................................................24, 29

*Dugan v. Rank*,
    372 U.S. 609 (1963)...........................................................................36

*Elgin v. Department of Treasury*,
    132 S. Ct. 2126 (2012)......................................................................41

*Fox v. Vice*,
    131 S. Ct. 2205 (2011)...............................................................25, 27

*Geowaste of Georgia, Inc. v. Tanner*,
    875 F. Supp. 830 (M.D. Ga. 1995) ..................................................34

*Gonzalez v. Raich*,
    545 U.S. 1 (2005)..............................................................................43

*Gros v. New Orleans City*,
    No. 12-cv-2322, 2014 WL 2506464 (E.D. La. June 3, 2014)...........30

*Hastert v. Illinois State Board of Election Commissioners*,
    28 F.3d 1430 (7th Cir. 1993) ...........................................................33

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)...........................................................................46

*Herrington v. County of Sonoma*,
    883 F.2d 739 (9th Cir. 1989) ...........................................................33

*IMS Health Inc. v. Sorrell*,
    No. 07-cv-188, 2012 WL 2915845 (D. Vt. July 17, 2012) ................30

*\*Independent Federation of Flight Attendants v. Zipes*,
    491 U.S. 754 (1989)............................................ 21, 22, 27, 29 30, 32

*Kentucky v. Graham*,
    473 U.S. 159 (1985)....................................................................21, 30

*Knox v. Chiang*,
    2:05-CV-02198-MCE, 2013 WL 2434606 (E.D. Cal. June 5, 2013)................30

*Kulkarni v. Nyquist*,
     446 F. Supp. 1274 (N.D.N.Y. 1977) ................................................................. 40

*Larson v. Domestic & Foreign Commerce Corp.*,
     337 U.S. 682 (1949) ......................................................................................... 36

*Lavin v. Husted*,
     764 F.3d 646 (6th Cir. 2014) ............................................................. 25, 29, 34, 40

*Lawrence v. Bowsher*,
     931 F.2d 1579 (D.C. Cir. 1991) ............................................................ 33, 34, 35

*Lindahl v. Office of Personal Management*,
     470 U.S. 768 (1985) ......................................................................................... 36

*Mallory v. Harkness*,
     923 F. Supp. 1546 (S.D. Fla. 1996) ......................................................... 27, 28

*Maloney v. City of Marietta*,
     822 F.2d 1023 (11th Cir. 1987) ....................................................................... 33

*MetroPCS California, LLC v. FCC*,
     644 F.3d 410 (D.C. Cir. 2011) ........................................................................ 39

*Newman v. Piggie Park Enterprises Inc.*,
     390 U.S. 400 (1968) ........................... 8, 9, 11, 17, 18, 19, 23, 24, 25, 30, 32, 45

*Northcross v. Board of Education of Memphis City Schools*,
     412 U.S. 427 (1973) .................................................................................. 18, 32

*Northwest Austin Municipal Utility District One v. Holder*,
     557 U.S. 193 (2009) ........................................................................................... 4

*Pollack v. Hogan*,
     703 F.3d 117 (D.C. Cir. 2012) ........................................................................ 29

*Pure Wafer, Inc. v. City of Prescott*,
     No. 13-cv-08236, 2014 WL 3797850 (D. Ariz. July 29, 2014) ..................... 29

*Republic Industries, Inc. v. Teamsters Joint Council No. 83*,
     718 F.2d 628 (4th Cir. 1983) .......................................................................... 42

*RHJ Medical Center, Inc. v. City of Dubois*,
No. 3:09-cv-131, 2014 WL 3892100 (W.D. Pa. Aug. 8, 2014) ........................29

*Rodriguez v. United States*,
480 U.S. 522 (1987)........................................................................39

*Ryals v. City of Englewood*,
No. 12-cv-02178, 2014 WL 2566288 (D. Colo. June 6, 2014)........................30

*Sable Communications of California, Inc.  v.*
*Pacific Telephone & Telegraph Co.*,
890 F.2d 184 (9th Cir. 1989) ...........................................................33

*\*Shelby County, Alabama v. Holder*,
133 S. Ct. 2612 (2013)................................................................1, 4, 5

*Shelby County, Alabama v. Holder*,
679 F.3d 848 (D.C. Cir. 2012).........................................................3, 4

*Shelby County, Alabama v. Holder*,
811 F. Supp. 2d 424 (D.D.C 2011)......................................................3

*Shelter Framing Corp. v. Pension Benefit Guaranty Corp.*,
705 F.2d 1502 (9th Cir. 1983), *rev'd on other grounds sub nom. Pension*
*Benefit Guranty Corp. v. R.A. Gray & Co*., 467 U.S. 717 (1984).....................42

*Shepard v. Madigan*,
11-CV-0405-MJR-PMF, 2014 WL 4825592 (S.D. Ill. Sept. 29, 2014)............. 29

*Supreme Court of Virginia v. Consumers Union of United States, Inc.*,
446 U.S. 719 (1980)........................................................................27

*Texas v. United States*,
No. 11-1303, 2014 WL 2758597 (D.D.C. June 18, 2014) ...............................26

*Traditionalist American Knights KKK v. City of Desloge*,
4:12CV2085 AGF, 2013 WL 6068895 (E.D. Mo. Nov. 18, 2013)...................30

*Turner v. District of Columbia Board of Elections & Ethics*,
354 F.3d 890 (D.C. Cir. 2004)................................................... 16, 28

*TVA v. Hill*,
437 U.S. 153 (1978).......................................................................39

*West Virginia University Hospitals, Inc. v. Casey*,
   499 U.S. 83 (1991).................................................................................35

**Federal Statutes**

2 U.S.C. § 904.................................................................................................41

2 U.S.C. § 922.................................................................................................41

5 U.S.C. § 5596...............................................................................................37

5 U.S.C. § 7701...............................................................................................37

7 U.S.C. § 2157...............................................................................................37

15 U.S.C. § 15.................................................................................................37

15 U.S.C. § 1667b...........................................................................................37

15 U.S.C. § 720e.............................................................................................41

15 U.S.C. § 2310.............................................................................................37

29 U.S.C. § 216...............................................................................................37

29 U.S.C. § 2617.............................................................................................37

31 U.S.C. § 3730.............................................................................................37

42 U.S.C. § 2000a-3........................................................................................18

42 U.S.C. § 2000e-5........................................................................................19

47 U.S.C. § 555...............................................................................................41

52 U.S.C. § 10303........................................................................................1, 2

52 U.S.C. § 10304........................................................................................1, 2

52 U.S.C. § 10310...........................................................................1, 2, 6, 7, 16, 17

52 U.S.C. § 20105...........................................................................................37

Pub. L. No. 100-449, 102 Stat 1851 (1988)..................................................41

Pub. L. No. 104-104, 110 Stat. 56 (1996)................................................................41

Pub. L. No 107-155, 116 Stat. 81 (2002)................................................................41

**Legislative Materials**

S. Rep. No. 94-295 (1975) ......................................................................................38

**Other Authorities**

Law Revision Counsel, Editorial Reclassification, *available at*
    http://uscode.house.gov/editorialreclassification/t52/index.html. ........................1

# **GLOSSARY**

VRA:          Voting Rights Act

## STATEMENT OF JURISDICTION

Pursuant to Section 14(b) of the Voting Rights Act of 1965 ("VRA"), Plaintiff-Appellant Shelby County, Alabama brought a facial constitutional challenge to Sections 4(b) and 5 of the VRA. *See* 52 U.S.C. § 10303(b); *id.* § 10304; *id.* § 10310(b).[1] The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 52 U.S.C. § 10310(b). On June 25, 2013, the Supreme Court of the United States held that Section 4(b) was facially unconstitutional and, as a result, no jurisdiction could be subject to "coverage" under the VRA's statutory formula. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2627-31 (2013). After the district court entered a final judgment in Shelby County's favor on October 11, 2013, Shelby County timely filed a motion for attorney's fees pursuant to Section 14(e) of the VRA on October 25, 2013. *See* 52 U.S.C. § 10310(e). On May 28, 2014, the district court issued an Order and Memorandum Opinion denying Shelby County's motion for attorney fees. *See* Joint Appendix ("JA") 60-95. Shelby County's notice of appeal was timely filed on June 3, 2014. JA 96. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[1] On September 1, 2014, the Office of the Law Revision Counsel reclassified provisions relating to voting and elections from Titles 2 and 42 into a new Title 52, Voting and Elections. *See* Office of the Law Revision Counsel, Editorial Reclassification, http://uscode.house.gov/editorialreclassification/t52/index.html. Sections 4(b), 5, and 14(b) previously were classified as 42 U.S.C. § 1973b(b), 42 U.S.C. § 1973c, and 42 U.S.C. § 1973*l*(b), respectively.

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion by denying Shelby County, the prevailing party in this action, its reasonable attorney's fees as authorized by Section 14(e) of the Voting Rights Act, 52 U.S.C § 10310(e) (formerly 42 U.S.C. § 1973*l*(e)).

## STATUTES AND REGULATIONS

Section 14(e) of the Voting Rights Act, 52 U.S.C. § 10310(e), states:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.

## STATEMENT OF FACTS

On April 27, 2010, Shelby County brought an action against the Attorney General of the United States ("Attorney General" or "Government") under Section 14(b) of the Voting Rights Act (now codified at 52 U.S.C. § 10310(b)) challenging the constitutionality of Section 4(b), 52 U.S.C. § 10303(b), and Section 5, *id.* § 10304, of the VRA. *See* JA 37-38, 56 (Complaint ¶¶ 1, 4, 6, 44). Shelby County was a "covered" jurisdiction under these provisions and thus required to obtain "preclearance" for all voting changes. 52 U.S.C. §§ 10303(b), 10304. Shelby County sought a declaration that Sections 4(b) and 5 were unconstitutional under the Fourteenth and Fifteenth Amendments, a permanent injunction, reasonable

attorney's fees and costs, and all other relief deemed appropriate by the court.  JA 56 (Complaint ¶ 44).

Several groups and individuals ("Defendant-Intervenors") sought to intervene early in the action, Dkt. 6 (June 11, 2010), Dkt. 9 (June 22, 2010), Dkt. 18 (July 1, 2010), which the district court allowed, Dkt. 29 (Aug. 25, 2010).  All parties thereafter filed cross-motions for summary judgment on the merits of Shelby County's claims.  On September 21, 2011, the district court issued an opinion and order granting the Government's and Defendant-Intervenors' cross-motions for summary judgment, and denying Shelby County's motion for summary judgment.  Dkts. 83, 84 (Sept. 21, 2011); *Shelby Cnty., Ala. v. Holder*, 811 F. Supp. 2d 424 (D.D.C. 2011).

Shelby County timely appealed and this Court heard argument on January 19, 2012.  On May 18, 2012, this Court issued a 2-1 decision affirming the district court's judgment.  *Shelby Cnty., Ala. v. Holder*, 679 F.3d 848 (D.C. Cir. 2012).  Circuit Judges Tatel and Griffith found both Section 4(b) and Section 5 constitutional, holding that the evidence of voting discrimination in covered jurisdictions assembled by Congress justified Section 5's remedial remedy and also justified Section 4(b)'s coverage formula under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment.  *Id.* at 884.  Senior Judge Williams dissented.  He would have found Section 4(b) unconstitutional because

its coverage formula was not responsive to current conditions and not "congruent and proportional" to the Fourteenth and Fifteenth amendment violations it sought to remedy. *Id*. at 885 (Williams, J., dissenting). Shelby County timely petitioned for a writ of certiorari, and the Supreme Court granted review. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 594 (Nov. 9, 2012).

The Supreme Court reversed in a 5-4 decision. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (June 25, 2013). Writing for the Court, Chief Justice Roberts recognized that "the conditions that originally justified [preclearance] no longer characterize voting in the covered jurisdictions." *Id.* at 2618. "'Voter turnout and registration rates now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels.'" *Id*. at 2625 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009)). The Court found it problematic that, despite this huge improvement, Congress in 2006 had reauthorized the VRA's historically based coverage formula (and indeed made it more stringent) for another 25 years. *Id.* at 2618. Given the massive continuing burden imposed upon covered jurisdictions and the coverage formula's failure to "identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions," the Court found Section 4(b) unconstitutional as exceeding Congress's powers under Section 5 of the 14th Amendment and Section 2 of the Fifteenth Amendment. *Id.* at 2622 n.2, 2629.

Given this holding with respect to Section 4(b), the Court declined to reach Section 5's constitutionality. *See id.* at 2631. Justice Thomas concurred, writing separately to explain why he would have found Section 5 unconstitutional as exceeding Congress's enforcement power under the Fourteenth and Fifteenth Amendments. *Id.* at 2631-32. Justice Ginsburg dissented, arguing that the evidence assembled by Congress justified the exercise of remedial power under the Reconstruction Amendments to subject the covered jurisdictions to preclearance. *See id.* at 2632-52.

Upon receiving the Supreme Court's mandate, the D.C. Circuit vacated its judgment, issued a new judgment vacating the district court's judgment, and remanded the case to the district court "to enter a declaratory judgment in favor of Shelby County on its claim that it is unconstitutional to use the Section 4(b) formula to identify the jurisdictions subject to the preclearance requirement of Section 5, and dismissing Shelby County's constitutional challenge to Section 5 as moot." Judgment, Dkt. #1459217, No. 11-5256 (D.C. Cir. Oct. 2, 2013). The district court issued its final order entering the declaratory judgment on October 11, 2013. Order, Dkt. 92 (Oct. 11, 2013).

Two weeks later, Shelby County timely filed a motion for attorney's fees. Shelby County argued that it was eligible for fees because it was the "prevailing party" in an action to "enforce the voting guarantees of the Fourteenth and

Fifteenth Amendment." *See* 52 U.S.C. § 10310(e). Shortly thereafter, the parties filed a joint motion to bifurcate the issue of fee entitlement (whether Shelby County is entitled to any attorney's fees under the VRA) from the issue of the "reasonable" fee to be awarded in the event Shelby County is eligible for fees. Joint Mot. for Bifurcation, Dkt. 96 (Nov. 4, 2013). The district court granted the motion, agreeing to delay consideration of the "fee amount" question until after resolution of the "fee entitlement" issue. Dkt. 98 (Nov. 5, 2013).

The Government thereafter filed its opposition to Shelby County's fee request on the "fee entitlement" issue, arguing that (1) sovereign immunity barred the claim and that Shelby County had forfeited any argument to the contrary; (2) Shelby County was not eligible for fees because this action is not an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment"; and (3) even if Shelby County were eligible for fees, the district court, in its discretion, should decline to award them. Defendant-Intervenors also filed an opposition to Shelby County's motion. The district court held a motions hearing on February 14, 2014.

The district court denied Shelby County's fee request in an opinion and order dated May 28, 2014. The court first rejected the Government's "aggressive" and "unsupported" sovereign immunity arguments, finding that the Government was liable on the merits of Shelby County's claim and that the Government had

6

explicitly waived sovereign immunity from fees under Section 14(e) and the Equal Access to Justice Act.  JA 65-67.

The court next examined whether Shelby County was eligible for fees under Section 14(e) of the VRA, which gives a district court the "discretion" to award attorney's fees to the "prevailing party" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C § 10310(e). Because the Government had conceded that Shelby County was the "prevailing party," the court viewed the only open statutory eligibility interpretation question as whether this case is an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."  *Id*.  The court found this provision susceptible to three possible interpretations concerning the parties who might be eligible for fees.

Under the first interpretation, only <u>plaintiffs</u> that filed a lawsuit seeking "to enforce the voting guarantees of the fourteenth or fifteenth amendment" would be eligible for attorney's fees.  The court rejected this interpretation as conflicting with Circuit precedent.  JA 74-76 (citing *Commr's Ct. of Medina Cnty., Tex. v. United States*, 683 F.2d 435 (D.C. Cir. 1982); *Donnell v. United States*, 682 F.2d 240 (D.C. Cir. 1982); *Castro Cnty., Tex. v. Crispin*, 101 F.3d 121 (D.C. Cir. 1996)).  Under the second interpretation, any party could be eligible for attorney's fees as long as <u>that party</u> was the party seeking "to enforce the voting guarantees of

the fourteenth or fifteenth amendment." The court rejected this interpretation as well, as conflicting with the action-directed text of Section 14(e). JA 75. Under the third interpretation, any prevailing party would be eligible for attorney's fees as long as the <u>lawsuit</u> could be described as "an action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." JA 78. The court concluded that this interpretation was "the best answer," JA 79, and found that this case might best be considered to be an "action or proceeding" under Section 14(e). JA 80 n.12.

The Court declined to decide whether the textual eligibility requirements of Section 14(e) had been met here, however, because it found another reason for refusing an award to Shelby County: Section 14(e) only allows fees to a prevailing party in the district court's "discretion," and the court believed it should exercise its discretion to decline to award fees to Shelby County. JA 80-81.

The district court began its "discretion" analysis by analogizing VRA fee discretion to the discretion available under the fee provisions of other federal civil rights laws. JA 85. It noted that the Supreme Court had used two different standards, applicable in distinct circumstances, to "cabin district court discretion in awarding attorney's fees under the federal civil rights laws." JA 85. Under the more permissive standard articulated in *Newman v. Piggie Park Enterprises, Inc.*, where a prevailing party is seeking protection of its statutory or constitutional

rights, the Court should award fees "unless special circumstances would render such an award unjust."  390 U.S. 400, 402 (1968).  Under a more demanding standard articulated in *Christiansburg Garment Co. v. EEOC*, a defendant successfully resisting a civil rights claim should recover fees only if its opponent's position was "frivolous, unreasonable, or without foundation," 434 U.S. 412, 421 (1978).  Which of these standards should apply to guide the district court's discretion in this case, the court declared, was "a question of first impression."  JA 80.

The district court decided to apply the legal standard that would ensure that "attorney's fees [were] awarded only in circumstances consistent with [the VRA's] purpose."  JA 80.  The court read the *Piggie Park* and *Christiansburg Garment* standards as "based on purposive considerations and a value judgment about the subjective intent of Congress."  JA 82.  Examining the VRA and the legislative history of the fee provision, the court determined that the sole purpose of Section 14(e) is "to encourage private attorneys general to bring lawsuits vindicating individual voting rights."  JA 89.  The court then held that Shelby County's action sought "to *oppose* enforcement of individual voting rights," JA 91, and that Shelby County's position was "openly *hostile* to Congress's policy choices, attacking them as unconstitutional," JA 94 (emphasis in original).  Because, in the court's view,

Shelby County did not "fit the statute's preferred profile," JA 91, the court exercised its discretion under the *Christiansburg Garment* standard.

Applying *Christiansburg Garment*, the district court concluded that the Government's and the Defendant-Intervenors' positions were not "frivolous, unreasonable, or without foundation," JA 95 (quoting *Christiansburg*, 434 U.S. at 421), and therefore Shelby County was not entitled to its reasonable fees.[2]  Shelby County timely appealed.

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant Shelby County brought this action under Section 14(b) of the VRA to secure for itself and its citizens, and millions of citizens in other jurisdictions subjected to pre-clearance under the 2006 reauthorization of the Voting Rights Act, the right to initiate changes to their voting practices and procedures without prior review and authorization by the Attorney General. Shelby County argued that the reauthorization crossed the boundary between congressional power to enforce voting rights under the Fourteenth and Fifteenth Amendments and the proactive limitation that the exercise of that power be "appropriate" in light of current conditions.  The Government vigorously opposed Shelby County's challenge on the ground that the reauthorization did not violate Congress's "enforcement" powers under the Fourteenth and Fifteenth

---

[2] The court never reached the question of whether the amount of fees Shelby County sought was reasonable.

Amendments, but Shelby County prevailed in the Supreme Court.  The merits proceeding concluded with a declaration that subjecting jurisdictions to preclearance based on the Section 4(b) formula exceeded Congress's powers to enforce the Fourteenth and Fifteenth Amendments, a judgment in Shelby County's favor, and ultimately a restoration of full voting-process authority to the formerly "covered" jurisdictions.

Shelby County's fee petition invoked Section 14(e) of the VRA, which allows the "prevailing party" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment" to recover its "attorney's fee, reasonable expert fees, and other reasonable litigation expenses" in the "discretion" of the Court.  Shelby County argued that its merits action, brought under Section 14(b) of the VRA, fit squarely within the fee provision and that the Court was required to exercise its "discretion" under the permissive standard established in *Newman v. Piggie Park*, 390 U.S. 400 (1968).

The district court discussed at length, but ultimately left open, the question whether Shelby's action fit within the fee entitlement provision of the VRA. Nevertheless, the district court's analysis of statutory eligibility correctly determined that the language of the fee provision did not permit eligibility to be determined by whether the prevailing party acted as plaintiff or defendant in the VRA action or by the right asserted by that party.  Indeed, the district court

11

properly recognized that Congress had keyed eligibility to the <u>issue</u> presented in the action regardless of the party who raised it.

Tacitly assuming Shelby's eligibility, at least *arguendo*, the district court skipped to determining the appropriate standard for exercising its "discretion." Claiming an issue of "first impression," the district court focused on "purposive considerations" to hold that the restrictive standard of *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978), should apply to Shelby County's fee claim, and that this standard required its denial.

The district court's espousal of the *Christiansburg Garment* standard overlooked the absence here of the two "strong equitable considerations" on which the Supreme Court rested its *Christiansburg Garment* decision.  The Court in *Christiansburg* had distinguished plaintiff awards governed by *Piggie Park* from award claims by prevailing defendants because Civil Rights Act plaintiffs alone were the "chosen instrument of Congress" to vindicate that Act's policy, and an award of fees as a matter of course to a prevailing defendant would discourage potential Civil Rights Act plaintiffs from bringing the kinds of claims that Congress meant to encourage.  *Id*. at 418.  Second, while plaintiffs were seeking fees against established violators of federal law, defendants were addressing only failed claims generally advanced in good faith.  *Id*.

12

Those equities cannot counsel against an award here.  Shelby County was not merely defending its conduct but pursuing a jurisdictional path specifically established by Congress to permit the courts to weigh the competing equities of local voting control and federally safeguarded rights in establishing the boundaries of appropriate enforcement action under the Fourteenth and Fifteenth Amendments.  Shelby County contended, and succeeded in establishing, that Section 4(b) exceeded Congress's enforcement powers.   And while the *Christiansburg Garment* Court emphasized that equity favors making the wrongdoer pay, here it was the Attorney General's enforcement of an unconstitutional restraint on Shelby County's voting process initiatives that the Supreme Court held to be constitutionally unwarranted conduct.  Absent the bases giving rise to *Christiansburg*, the district court's reliance on its restrictive fee standard was wholly inappropriate.

Shelby County's request cannot be meaningfully distinguished from the many fee awards to prevailing plaintiffs under the *Piggie Park* standard.  Shelby County was a successful plaintiff bringing an action under the VRA.  Shelby County asserted an interest under the Fourteenth and Fifteenth Amendments and the Supreme Court held that interest to be unlawfully compromised by the enforcement of preclearance requirements based on the Section 4(b) coverage formula.  The merits decision here restored Shelby County's rights under the

13

Constitution.  It is telling that the Government has cited <u>no case</u> in which a plaintiff sued under a statute for which fees are available, prevailed, and had its request for fees from the defendant judged under a standard other than *Piggie Park*.

Pervading the district court's analysis was its conclusion that Shelby County did not file this lawsuit in an attempt "to enforce the voting guarantees of the fourteenth or fifteenth amendment" and instead "opposed" those rights and attacked Congress's policy choices as unconstitutional.  Even if true, Shelby County's motivations would be irrelevant under well-established decisional law of this Circuit and the Supreme Court.  But the conclusion also mischaracterizes Shelby County's position.  Shelby County clearly viewed the limitations in the Fourteenth and Fifteenth Amendments to "appropriate" enforcement as concomitant guarantees of the right of its citizens to control voting procedures consistently with the spirit of the Tenth Amendment and Article IV of the Constitution.  The framers of the Fourteenth and Fifteenth Amendments could have empowered Congress to seize plenary power over state elections in order to protect individual voting rights but chose instead to balance that imperative with respect for the States' voting authority in the federal system by confining Congress to "appropriate" actions.  The district court may not have agreed, as reflected in its initial merits decision, that Shelby County's rights had been trammeled because Congress had not struck the appropriate balance.  But the Supreme Court held

14

otherwise and accorded Shelby County the voting rights guarantee that Shelby County sought in its complaint.

In short, and as explained in more detail below, this case was undeniably a dispute brought directly under the VRA concerning how best to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. Consistent with all applicable precedent, the *Piggie Park* standard therefore controlled the Court's discretion and required the award of a reasonable fee to Shelby County.

## ARGUMENT

## I.    STANDARD OF REVIEW

Although this Court "generally reviews the district court's denial of applications for attorney's fees for abuse of discretion, a district court abuses its discretion if it did not apply the correct legal standard or if it misapprehended the underlying substantive law." *Conservation Force v. Salazar*, 699 F.3d 538, 542 (D.C. Cir. 2012) (quotation marks and ellipsis omitted). In such instances, this Court must "examine de novo whether the district court applied the correct legal standard." *Id.* Because the decision below was based on a choice of the applicable legal standard—*Piggie Park* or *Christiansburg Garment*—this Court's review is *de novo*.

## II.     THE DISTRICT COURT ERRED IN NOT APPLYING THE *PIGGIE PARK* STANDARD.

Section 14(e) of the Voting Rights Act provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee." 52 U.S.C. § 10310(e). Although this language appears to give the district court broad latitude in considering attorney's fees, "it is now axiomatic that the discretion of a district court in deciding whether to award such fees to a prevailing party is narrowly limited." *Turner v. D.C. Bd. of Elections & Ethics*, 354 F.3d 890, 895-96 (D.C. Cir. 2004) (citation omitted). For almost fifty years, the Supreme Court has instructed district courts to award attorney's fees to plaintiffs prevailing under civil rights statutes unless special circumstances would make such an award unjust. That is the standard that should have guided the exercise of "discretion" under Section 14(e) in this case.

### A.     The *Piggie Park* Standard Must Guide The District Court's Discretion Because Congress Specifically Authorized Shelby County's Successful Pursuit Of State Voting Autonomy.

#### 1.     Section 14(b) Of The VRA Provided Jurisdiction For Shelby County's Action.

The district court acknowledged that Section 14(b) "expressly permits a lawsuit against the United States . . . and Shelby County sued under it." JA 70 (quotations omitted). Shelby County brought its lawsuit under Section 14(b) of the VRA, which creates a cause of action and grants the District Court for the District of Columbia exclusive jurisdiction to issue a "declaratory judgment . . . or

16

permanent injunction against the execution or enforcement of any provision of [the VRA] or any action of any Federal officer or employee pursuant hereto."   52 U.S.C. § 10310(b).  The Supreme Court recognized long ago that Section 14(b) specifically authorizes plaintiffs to seek an "injunctive action" that is "aimed at prohibiting enforcement of the provisions of the Voting Rights Act" including lawsuits "attack[ing] . . . the constitutionality of the Act itself."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 558 (1969).

Accordingly, any analysis of Shelby County's entitlement to fees here must proceed on the understanding that Shelby County's claim is one that Congress acknowledged and facilitated through the creation of a specific cause of action under the VRA.

> 2.   <u>Where A Party Prevails In Establishing Rights In A Section 14(b) Action, Supreme Court And D.C. Circuit Precedent Require Application Of The *Piggie Park* Standard.</u>

The Supreme Court and this Court have issued several decisions establishing the proper standard for guiding the exercise of district court "discretion" under Section 14(e) and similar fee-shifting statutes.  Those decisions confirm that plaintiffs prevailing on claims under statutes with fee-shifting provisions should recover their fees unless "special circumstances" exist in a particular case.

*Newman v. Piggie Park*, 390 U.S. 400 (1968) is the seminal decision in this area.  In that case, the plaintiffs brought an action under Title II of the Civil Rights

Act of 1964 and obtained an injunction prohibiting racial discrimination at various drive-in restaurants.  The prevailing plaintiffs then sought attorney's fees under Title II's fee-shifting provision, which gives district courts "discretion" to award a "prevailing party" its reasonable attorney's fees in "any action commenced pursuant to this subchapter."  42 U.S.C. § 2000a-3.  There was no question that the *Piggie Park* plaintiffs brought an action under Title II or that they prevailed; the only question was whether the district court had abused its discretion in denying a fee award.  The Supreme Court found that it had, explaining that the fee-shifting provision at issue must operate to provide fees to successful plaintiffs in nearly all civil rights cases because successful plaintiffs under Title II "cannot recover damages" and "few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts" if they were "routinely forced to bear their own attorneys' fees."   390 U.S. at 402.  Accordingly, the Court concluded that a person "who succeeds in obtaining an injunction under [Title II] should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."  *Id*.  The Court's *Piggie Park* decision established the default standard for awarding fees to a prevailing party who sues under a statute for which fees are authorized and prevails. *See also, e.g.*, *Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427 (1973)

18

(reaffirming *Piggie Park* as default standard); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 262 (1975) (same).

The Supreme Court's more restrictive standard for the exercise of "discretion" under civil rights fee-shifting statutes arose in *Christiansburg Garment v. EEOC*, 434 U.S. 412 (1978). In that case, the Court for the first time examined whether a party prevailing against a civil rights complaint should obtain its fees absent "special circumstances." The *Christiansburg Garment* defendant had defeated a claim of racial discrimination under Title VII of the Civil Rights Act of 1964 as untimely, and sought to obtain its attorney's fees under Title VII's fee-shifting provision, invoking the district court's "discretion" to award "prevailing parties" attorney's fees. *See* 42 U.S.C. § 2000e-5(k).

The Court reaffirmed *Piggie Park* as a general rule, but found "two strong equitable considerations" suggesting that Title VII parties successfully resisting enforcement should be subjected to a more restrictive standard. 434 U.S. at 418. First, parties like the defendant in *Christiansburg Garment* were not "the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'" *Id.* (quoting *Piggie Park*, 390 U.S. at 402). In other words, typical Title VII defendants, particularly those like the defendant in *Christiansburg Garment* who prevail on a collateral issue, are thrust into litigation unwillingly and are not seeking to accomplish anything that Congress encouraged when it enacted

19

the statute in question; accordingly, their interests are adequately protected by recovering fees arising from vexatious litigation. Second, when a district court awards attorney's fees to a party enforcing Title VII, "it is awarding them against a violator of federal law." *Id.* That is not true where a Title VII defendant seeks fees from an innocent plaintiff who failed only to succeed in pursuing his good-faith case. In light of these equitable circumstances, awarding fees to all prevailing defendants as a matter of course "would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." *Id.* at 422. Put another way, the Court feared that allowing prevailing defendants to obtain fees on what might reasonably be deemed a version of the English rule could needlessly deter Title VII parties suffering discrimination from bringing meritorious actions for fear that a loss would impose a crushing burden. At the same time, Congress's inclusion of a neutrally worded fee provision (instead of a provision that allowed fees only to successful plaintiffs) meant that Congress also intended to protect likely defendants from the wrongful act of bringing burdensome and frivolous litigation. *Id*. The Court therefore concluded that district courts should exercise their discretion to award fees to a prevailing defendant only when the defendant could demonstrate that "the plaintiff's action was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id*.

Most recently, in *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754 (1989), the Supreme Court considered the appropriate "discretionary" standard where a prevailing plaintiff sought its fees from defendant-intervenors in a Title VII case. The Court again recognized *Piggie Park* as the presumptive standard for an award to a plaintiff prevailing in an action under the act in question. *Id.* at 759, 761. As in *Christiansburg Garment*, however, the Court examined "equitable considerations" to determine whether near-automatic fee awards would disturb the incentives Congress created when it enacted the fee-shifting provision. Emphasizing the "crucial connection" between "liability for violation of federal law and liability for attorney's fees under federal fee-shifting statutes," the Court found it inequitable to assess fees against "blameless intervenors" who inserted themselves into the action to preserve their own rights and not to defend actions ultimately deemed unlawful. *Id.* at 761-62 (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Liability on the merits and responsibility for fees go hand in hand.")). The Court also observed that awarding fees against an intervenor only under the *Christiansburg Garment* standard would maintain the incentive Congress created to enforce rights under Title VII against the wrongdoer because the plaintiff would recover its reasonable fees from the primary defendant wrongdoer under the permissive *Piggie Park* standard. *Id.* at 761. The Court's conclusion was also bolstered by its finding that it would be

inequitable to impose "one-way fee liability" on intervenors, as imposing such liability would "distort" the adversary process by giving the Title VII plaintiff a "disproportionate advantage with regard to fee entitlement." *Id*. at 764. Taken together, these equitable considerations convinced the Court that an exception to *Piggie Park* should apply where a successful plaintiff is seeking fees from a "blameless" intervenor, and that *Christiansburg Garment* in those circumstances provided the appropriate standard to guide the district court's discretion. *Id*. at 761.

This Court has extended these precedents to fee awards under Section 14(e) of the VRA. In particular, this Court has recognized that the *Piggie Park* standard applies where a plaintiff brings an action under the VRA and prevails. *See, e.g.*, *Medina Cnty.*, 683 F.2d at 438 n.2 ("In order to deny reasonable attorneys' fees to a prevailing party [under the VRA], the [district] court must find that special circumstances exist that would render such an award unjust.").

This Court also has recognized that any exceptions to this general rule must be based on "equitable considerations." In *Medina County*, for instance, this Court examined whether defendant-intervenors in a declaratory judgment action brought by a covered jurisdiction could recover their attorney's fees. The Court acknowledged that the *Piggie Park* standard is ordinarily applicable where a plaintiff brings an action under the statute and prevails and that *Christiansburg*

*Garment* is generally the standard where a plaintiff brings an action under the statute and the defendant prevails, but found that the equities favored allowing prevailing defendant-intervenors to obtain their fees under the circumstances because they had "voluntarily entered the suit" and were "seek[ing] to vindicate rights guaranteed by the Constitution." *Id.* at 440 & n.5. This Court reached a similar conclusion, for similar reasons, in *Donnell v. United States*. 682 F.2d at 245 ("Although awarding fees pursuant to section [14(e)] is discretionary, the legislative history makes clear that a prevailing party usually should recover fees.").

In sum, the relevant Supreme Court and D.C. Circuit cases stand for the proposition that a VRA party who, like Shelby County, initiates an action to assert rights under the statute or the Fourteenth and Fifteenth Amendments is entitled to its fees unless special circumstances would render such an award unjust. *See Piggie Park*, 390 U.S. at 402. The only exceptions the courts have recognized arise when near-automatic fee eligibility would chill the kinds of enforcement cases that Congress wanted to encourage or impose fee liability on a "blameless" party.

3.    <u>Awarding Fees To Shelby County Against The Government Would Further The Incentives Congress Created Through Section 14(e) And Properly Tax The Government For Enforcing An Unconstitutional Statute.</u>

Shelby County's pursuit of this action falls directly within the *Piggie Park* paradigm.  Not only did Shelby County sue directly under the VRA (making it a plaintiff in a technical sense), which brings this action within the literal bounds of Section 14(e), but it did so voluntarily in order to "advance the public interest by invoking the injunctive powers of the federal courts" on behalf of itself and hundreds (if not thousands) of similarly situated jurisdictions and their millions of citizens.  *Piggie Park*, 390 U.S. at 402.  Shelby County was not prompted to bring the action to avoid DOJ enforcement against a particular voting practice, but by its desire to restore proper constitutional order and to regain for its citizens their fundamental right to structure and order elections in the way they see fit, subject to universal constitutional restraints.  *Cf. Dorn's Transp., Inc. v. Teamsters Pension Trust Fund*, 799 F.2d 45, 50 (3d Cir. 1986) (treating declaratory judgment plaintiff as a defendant under fee-shifting statute because plaintiff brought the action only after it "was faced with a threatened assessment of withdrawal liability").  Without Shelby County's affirmative litigation, unconstitutional impairment of local voting rights autonomy would have persisted.  Thus, Shelby County is the kind of "private

24

attorney general" to whom *Piggie Park* referred.[3]    The district court's characterization of Shelby County as a defendant in plaintiff's clothing was erroneous.

Properly recognizing Shelby County as a true plaintiff under the VRA, then, would have required the district court to exercise its discretion under the *Piggie Park* standard unless the types of equities present in *Christiansburg Garment* or *Zipes* were present here.  But consideration of those equities provides no basis for a departure from *Piggie Park*.

<u>First</u>, making attorney's fees liberally available to Shelby County from the Government in this instance would not undermine Congress's goal of encouraging actions to secure voting rights under the VRA.   Incentives for aggrieved individuals to litigate under the VRA would not change: future plaintiffs could still file a complaint under the VRA and anticipate recovering their fees under *Piggie Park* if they won and incurring liability for fees only if the *Christiansburg Garment* standard were met.  "[B]lameless" intervenors still would have comfort that they could intervene and assert their rights while being protected from

---

[3] The district court appeared to believe that a "private attorney general" refers only to persons asserting that their individual constitutional or statutory rights have been violated.    JA 89-90, 94.   But the cases make clear that the "private attorney general" presumptively eligible for fees in civil rights fee-shifting cases is a party who brings an action under the statute seeking to establish rights on behalf of himself and others similarly situated.  *Fox v. Vice*, 131 S. Ct 2205, 2213 (2011); *Piggie Park*, 434 U.S. at 402; *Lavin v. Husted*, 64 F.3d 646, 651 (6th Cir. 2014).

catastrophic fee awards under *Zipes*. The litigation calculus would change only for those seeking to confront improper limitations on their control of voting procedures.

In fact, it is the <u>district court's</u> construction of Section 14(e) that would grossly distort the incentives to litigate under the VRA. Jurisdictions like Shelby County who find themselves in a similar situation in the future and are contemplating a similar lawsuit would have to undertake an enormous risk. Their potential payout would be minimal: they cannot obtain damages (because the statute does not contemplate them) despite the substantial costs arising from unconstitutional enforcement and there would be little hope of recovering attorney's fees under the strict *Christiansburg Garment* standard. But a litigation loss could be disastrous, given that defendant-intervenors are almost always granted leave to intervene, *see* Dkt. 6-1 at 5-6 (Cunningham Mot. to Intervene) (listing cases), would almost certainly receive attorney's fees under the *Piggie Park* standard, *see, e.g., Castro Cnty., Tex.*, 101 F.3d at 126, and usually incur substantial attorney's fees, *see, e.g.*, *Texas v. United States*, 2014 WL 2758597, at *11 (D.D.C. June 18, 2014) (awarding defendant-intervenors in district court redistricting litigation over $1 million in attorney's fees).[4] Faced with the prospect

---

[4] As the district court recognized, if Shelby County had lost before the Supreme Court, "defendant-intervenors would likely have sought attorney's fees" and the court "presumably would have awarded" them. JA 77. Defendant-Intervenors in

of double fee liability and little to no chance of fee recovery, "only a lunatic or a fanatic," *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), would press forward to bring a lawsuit seeking to protect its constitutional rights. That is precisely the kind of "distortion" of incentives that the Supreme Court has sought to avoid in applying equitable concepts to fee-shifting statutes like Section 14(e), and which strongly supports applying *Piggie Park* here. *See Christiansburg Garment*, 434 U.S. at 419; *Zipes*, 491 U.S. at 763-64 & n.4 (fee-shifting statutes should not be construed so as to impose "one-way fee liability" on parties who bring lawsuits merely "to defend their own constitutional or statutory rights").

Second, a fee award against the Government would not be inequitable because the Government is not "blameless" or "innocent" like the Title VII plaintiff in *Christiansburg Garment* or the intervenors in *Zipes*. The Attorney General actively enforced an unconstitutional statute to Shelby County's detriment. That fact—and only that fact—prompted Shelby County to pursue this lawsuit. *See Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (*Piggie Park* applies where a plaintiff prevails against "the party whose misconduct created the need for legal action.").

---

this case were represented by eighteen lawyers from seven different law firms or organizations. There is no doubt that Shelby County would have been handed a massive bill had the Supreme Court gone the other way on the merits.

The district court apparently believed that the Attorney General could not be treated as a "violator of federal law" because he was a mere enforcer of a federal statute that was "pass[ed] . . . through the normal legislative process." JA 93. That is incorrect. "The Supreme Court has acknowledged that fee awards against enforcement officials are run-of-the mill occurrences. 'Mere' enforcers of unconstitutional laws may be held liable for attorneys' fees even if their involvement in the litigation has been minor or they have argued that their enforcement actions are improper and have lobbied for the underlying law to be changed." *Turner*, 354 F.3d at 898 (citing *Sup. Ct. of Va. v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 739 (1980)); *see also, e.g.*, *Mallory v. Harkness*, 923 F. Supp. 1546 (S.D. Fla. 1996) (finding State Bar liable for fees under *Piggie Park* even though it did not enact the statute at issue because it "willingly enforced" the unconstitutional statute and finding State Attorney General liable under *Piggie Park* because he "vigorously defended" the unconstitutional statute). Attorney's fees are awarded because "the greater wrong would be to leave unpaid the attorney's fees and expenses of a successful . . . plaintiff who has undertaken significant risks and expenses to vindicate constitutional rights."[5] *Turner*, 354 F.3d at 898. An award of reasonable fees to

---

[5] Perhaps for this reason, the Third Circuit has recognized that "equitable considerations" should result in a <u>defendant</u> becoming eligible for fees under *Piggie Park* instead of *Christiansburg Garment* where the defendant "vindicated a

Shelby County would clearly promote "the general policy that wrongdoers make whole those whom they have injured." *Zipes*, 491 U.S. at 762.

There is no meaningful difference in the injury caused by enforcement of an unconstitutional statute and an unconstitutional *ad hoc* decision that leads to the same result—both affect the injured party in the same way.[6] For that reason, there are scores of decisions under Section 14(e) of the VRA and 42 U.S.C. § 1988—similarly worded fee-shifting provisions that deal almost exclusively with governmental defendants—that impose fee liability under *Piggie Park* where "enforcement" of legislative enactments is at issue. *See, e.g.*, *Lavin v. Husted*, 764 F.3d 646 (6th Cir. 2014) (awarding fees after successful challenge to 30-year-old campaign finance law that had not been enforced).[7]

_____

constitutional right or benefitted a large number of people." *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund*, 799 F.2d 45, 50 n.6 (3d Cir. 1986).

[6] A legal fiction has been built around the concept that the enforcement of an unconstitutional statute is *ultra vires* and that the enforcement official can be sued for a declaration as to the statute's unconstitutionality. *See Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012). Under this Court's precedents, then, enforcing an unconstitutional statute makes one just as "blameworthy" as taking those actions on an *ad hoc* basis.

[7] Similar recent decisions abound. *See, e.g.*, *Davis v. Perry*, 991 F. Supp. 2d 809 (W.D. Tex. 2014) (awarding fees following successful equal protection challenge to state redistricting plan); *Shepard v. Madigan*, 11-CV-0405-MJR-PMF, 2014 WL 4825592 (S.D. Ill. Sept. 29, 2014) (awarding attorney's fees following successful Second Amendment challenge to state statute); *RHJ Med. Ctr., Inc. v. City of Dubois*, No. 3:09-cv-131, 2014 WL 3892100 (W.D. Pa. Aug. 8, 2014) (awarding fees following successful equal protection challenge to city zoning ordinance); *Pure Wafer, Inc. v. City of Prescott*, No. 13-cv-08236, 2014 WL 3797850 (D. Ariz.

In sum, the appropriate standard is clear: Because Shelby County succeeded in obtaining a declaration under the VRA for its own benefit and the benefit of others, it should "recover an attorney's fee unless special circumstances would render such an award unjust." *Piggie Park*, 390 U.S. at 402. Given the "crucial connection" between "liability for violation of federal law and liability for attorney's fees under federal fee-shifting statutes," *Zipes*, 491 U.S. at 762, there is no justification for departing from the *Piggie Park* standard here.[8]

---

July 29, 2014) (awarding fees following successful Contracts Clause challenge to city environmental ordinance); *Ryals v. City of Englewood*, No. 12-cv-02178, 2014 WL 2566288 (D. Colo. June 6, 2014) (awarding fees following successful state-law preemption challenge to city ordinance imposing residency restrictions on sex offenders); *Gros v. New Orleans City*, No. 12-cv-2322, 2014 WL 2506464 (E.D. La. June 3, 2014) (awarding attorney's fees where enforcement of city ordinance violated plaintiffs' First Amendment rights); *Traditionalist Am. Knights of the KKK v. City of Desloge*, 4:12CV2085 AGF, 2013 WL 6068895 (E.D. Mo. Nov. 18, 2013) (awarding attorney's fees following as-applied First Amendment challenge to local solicitation ordinance); *Knox v. Chiang*, 2:05-CV-02198-MCE, 2013 WL 2434606 (E.D. Cal. June 5, 2013) (awarding fees following as-applied challenge to state-mandated payment of union dues); *IMS Health Inc. v. Sorrell*, No. 07-cv-188, 2012 WL 2915845 (D. Vt. July 17, 2012) (awarding fees after Supreme Court declared state statute unconstitutional as in violation of the First Amendment).

[8] The district court acknowledged that "'fee liability runs with merits liability' [and] the United States lost this case on the merits," JA 70 (quoting *Kentucky v. Graham*, 473 U.S. 159, 168 (1985)), but the court failed to recognize that such liability also means that the Government is the wrongdoer here, regardless of whether it acted in good faith.

**B.      The District Court's "Purposive" Analysis Is Not Supported By The Case Law And Misconstrues Section 14(e).**

Although this case falls squarely within the *Piggie Park* paradigm for the reasons set forth above, the district court found that it would be inappropriate to use the *Piggie Park* standard when exercising its discretion in this case.  Rather than start with a recognition that Shelby County sued under the VRA and ask whether there would be any good reason <u>not to apply</u> the *Piggie Park* standard, it started by looking at what it deemed to be Congress's purposes in enacting Section 14(e) and asked whether there would be any good reason <u>to apply</u> the *Piggie Park* standard.  This analysis was flawed in several ways.

**1.      The District Court's Use Of A "Purposive" Analysis Is Not Supported By The Cases It Cites.**

The district court invoked six cases as authority for its theory that its "purposive" approach was the appropriate method for determining whether the *Piggie Park* or *Christiansburg Garment* standard should guide its exercise of discretion in this case: *Piggie Park*, *Northcross v. Board of Education of the Memphis City Schools*, *Christiansburg Garment*, and *Zipes* from the Supreme Court; and *Donnell* and *Medina County* from the D.C. Circuit.  JA 82-88.  After examining these cases, the district court concluded that the choice of an appropriate standard would ultimately turn on "a value judgment about the subjective intent of Congress" in enacting the fee provision at issue, JA 82, as

31

measured against "the actual <u>motivations</u> of the plaintiff and the defendant in a particular case," JA 92 (emphasis added).

However, these cases—whether considered individually or collectively—do not support any such proposition. The district court correctly observed that the decisions in each of those cases commented on the purpose of the particular fee-shifting statute at issue. But they were hardly rigorous analyses. In fact, the "purpose" of each of the statutes at issue was identical: to encourage plaintiffs to bring the particular causes of action that Congress had created in the act at issue.[9] *See Piggie Park*, 390 U.S. at 402 (Title II of the Civil Rights Act of 1964); *Northcross*, 412 U.S. 427, 428 (1973) (Emergency School Aid Act of 1972); *Christiansburg Garment*, 434 U.S. at 418, 422 (Title VII of the Civil Rights Act of 1964); *Zipes*, 491 U.S. at 761 (Title VII of the Civil Rights Act of 1964); *Donnell*, 682 F.2d at 245 (VRA); *Medina Cnty.*, 683 F.2d at 439-40 (VRA). None of these decisions took the further step of attempting to determine <u>the kinds of plaintiffs</u> Congress intended to incentivize and those it did not, or <u>which arguments</u> it favored and which ones it did not (let alone the actual "motivation" of the claiming party).

---

[9] These were unremarkable findings in light of the fact that fee-shifting statutes are designed to encourage through economic incentives the types of actions falling within the scope of the statute.

Not only do the decisions the district court cites not support its "purposive" analysis, but other decisions make clear that the type of plaintiff-specific and motivation-specific judgment the district court employed is wholly inappropriate. For example, courts often award fees to unsympathetic litigants who, although not the kind of parties Congress envisioned when it enacted fee-shifting statutes, fell within the enabling language. *See, e.g., Maloney v. City of Marietta*, 822 F.2d 1023, 1026 (11th Cir. 1987) (awarding attorney's fees to a white male plaintiff under Section 14(e) of the VRA); *Sable Commc'ns of Cal. Inc. v. Pac. Tel. & Tel. Co.*, 890 F.2d 184, 193 (9th Cir. 1989) (awarding attorney fees under 42 U.S.C. § 1988 to a "large corporation" seeking to "protect [a] multimillion-dollar business"); *Coyote v. Roberts*, 502 F. Supp. 1342, 1354 (D.R.I. 1980) (awarding attorney's fees under the Civil Rights Attorney's Fees Awards Act to admitted prostitutes over the government's objection that it was not in "the interest of the public [to] protect[] and legitimiz[e] prostitution"). Nor have particular plaintiffs' motivations been determinative. *See, e.g., Herrington v. Cnty. of Sonoma*, 883 F.2d 739, 744 (9th Cir. 1989) (awarding fees even though the plaintiff was motivated by "personal financial gain rather than a desire to promote constitutional rights [or] the public at large"). Nor have their individual financial circumstances led to a different result. *See, e.g., Hastert v. Ill. State Bd. of Election Comm'rs*, 28 F.3d 1430, 1443 (7th Cir. 1993) (awarding fees even though the plaintiff had the

"ability to pay for legal representation"); *Lavin*, 764 F.3d at 650 (finding district court abused its discretion when it considered the fact that plaintiffs were wealthy doctors and not the typical civil rights plaintiff); *Geowaste of Ga., Inc. v. Tanner*, 875 F. Supp. 830, 833-34 (M.D. Ga. 1995) (neither nature of the predicate right violated nor financial wherewithal of plaintiff affected fee analysis).

Indeed, this Court's decision in *Lawrence v. Bowsher*, 931 F.2d 1579 (D.C. Cir. 1991), is completely at odds with the "purposive" analysis the district court employed.  In *Lawrence*, this Court analyzed whether a plaintiff who prevailed in a discrimination suit against the General Accounting Office under various civil rights statutes was entitled to attorney's fees.  Noting that the plaintiff had prevailed only by convincing the D.C. Circuit that Title VII did not cover certain GAO employees until 1980, the district court denied fees because it believed the plaintiff's position "failed to advance the public benefit" and was "positively harmful to the civil rights of others."  *Id*. at 1580 (citation omitted).  This Court firmly rejected this reasoning, holding that a district court "may not deny fees to a prevailing plaintiff simply because his litigating position, although a correct interpretation of the law, does not comport with the court's vision of a position that would, in a broad sense, protect civil rights."  *Id*. (quotations omitted).  Instead, a plaintiff who prevails in an action brought under a qualifying civil rights statute "is entitled to reasonable attorney's fees independent of the district court's view of the

greater good for the greater number." *Id*.  Thus, whether or not this Court believes that the merits result of this litigation is undesirable from the perspective of the greater good, *Lawrence* stands squarely for the proposition that Shelby County's fee entitlement does not depend on the district court's disagreement with the Supreme Court's merits decision.

2.    The District Court Badly Misconstrued Congress's Purposes In Enacting Section 14(e).

Utilizing its "purposive" analysis, the district court found that the only purpose of Section 14(e) is to encourage private litigants to bring litigation to vindicate individual voting rights against jurisdictions like Shelby County, and that Congress did not intend to encourage any other kind of litigation under the VRA. JA 89-94.  In support, the district court relied on (1) cases generally stating that the purpose of Section 14(e) is the same as with other civil rights fee-shifting statutes, JA 89-90; (2) the legislative history of Section 14(e), which indicated an intention to enable private citizens to bring meritorious claims vindicating voting rights, JA 90, 92-93; and (3) its own judgment that Congress would not have wanted to incentivize litigation that would nullify its own Act, JA 94.  The district court's assessment of congressional purpose was flawed in multiple respects.

First, the best evidence of what Congress intended is the words of the statute it enacted.  *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of [Congress'] purpose is the statutory text adopted by both Houses

of Congress and submitted to the President"). In Section 14(e), Congress enacted a broadly worded fee provision that on its face provided an economic incentive to assert <u>all</u> types of voting-related claims under the VRA, including Section 14(b) claims challenging the constitutionality of the VRA itself.[10] At the time Congress enacted Section 14(e) in 1975 and certainly by the 2006 reauthorization, it was well-established that challenges to the constitutionality of the VRA were among the "enforcement" actions permitted by Section 14(b), *see Allen*, 393 U.S. at 558, and that the *Piggie Park* standard applied to prevailing plaintiffs in actions brought under civil rights statutes. Congress is presumed to have been aware of its own prior enactments and judicial constructions of them, and to have legislated against that backdrop. *See Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 782 n.15 (1985).

---

[10] Notably, Congress did not have to create a cause of action to allow jurisdictions adversely affected by the VRA to bring an action to declare a particular provision of the VRA unconstitutional—the Supreme Court has long recognized that declaratory judgment actions of that type are cognizable even without a statute specifically authorizing them. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949) (holding that "suits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity); *see Dugan v. Rank*, 372 U.S. 609, 621-22 (1963) (same). That Congress created a cause of action that specifically allowed jurisdictions like Shelby County to challenge the constitutionality of the VRA provides a strong indication that Congress intended to encourage them.

Just as notable is what Congress did <u>not</u> do.  If Congress had wanted the district courts to undertake the kind of party-specific or motivation-specific analysis that the district court performed, it could have drafted Section 14(b) so as to exclude particular "disfavored" litigants or claims.[11]  It did not.  This too suggests that Congress intended that fees be made freely available, as they are under every other civil rights statute, to any litigant who brings an action under the act itself and prevails.

<u>Second</u>, the fact that the legislative history of Section 14(e) focuses on encouraging lawsuits by disadvantaged individuals cannot be dispositive of the question presented here.  The district court rightly acknowledged that the Senate Committee Report accompanying the bill that became Section 14(e) indicated an

---

[11] Congress certainly knows how to do so when it wants to.  *See, e.g.*, 29 U.S.C. § 216(b) (fees available to prevailing "plaintiff or plaintiffs"); 5 U.S.C. § 7701(g)(2) (fees available to prevailing plaintiff "employee or applicant for employment"); 5 U.S.C. § 5596(b)(1)(A)(ii) (fees available to an "employee of an agency" who was "affected by an unjustified or unwarranted personnel action"); 7 U.S.C. § 2157(d) (fees available to any person "injured in its business or property by reason of a violation of this section"); 15 U.S.C. § 15(a) (fee available to any "person who shall be injured in his business or property"); 15 U.S.C. § 1667b(a) ("lessee" entitled to fee); 15 U.S.C. § 2310(d)(2) (fees available to prevailing "consumer"); 29 U.S.C. § 2617(a)(3) ("plaintiff" may be awarded fees if it obtains a "judgment"); 31 U.S.C. § 3730(d)(4) (fees "shall" be awarded to prevailing relator under False Claims Act, but may only be awarded to a prevailing defendant if "the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment").  Indeed, in another section of the Voting Rights Act, Congress limited the availability of attorney's fees to situations in which a party brings an action "to enforce the original judgment of the court."  52 U.S.C. § 20105(c).

intention to encourage "private attorneys general" to bring actions to "enforce the rights protected by the constitutional clause or statute under which fees are authorized by these sections." S. Rep. No. 94-295, at 40 (1975). But nothing in the legislative history suggests that Congress was disavowing promotion of other types of litigation authorized under the statute, including "enforcement" cases brought under Section 14(b), particularly where awarding fees in such cases would not interfere with its stated goal of incentivizing individuals to bring voting rights grievances to the courts.[12]

Even if the legislative history spoke clearly to the issues at hand, which it does not, the district court was not free, through the guise of a "purposive" analysis, to effectively re-write the statute that Congress passed. *See, e.g.*, *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699-700 (D.C. Cir. 2014) ("While it is possible to give the first two provisions full effect . . . , we would need to engage in a statutory rewrite to do so[.] … This is not our role."). Even if Congress were <u>principally</u> motivated by the value of lawsuits by individuals

---

[12] Other language in the Senate Report could be read as indicating an intention to promote <u>all</u> permissible litigation under the statute. S. Rep. No. 94-295 at 40 (indicating an intention to promote enforcement of "statutes enacted under" the Fourteenth and Fifteenth Amendments); *id.* (litigants should not be discouraged from bringing litigation to "vindicate fundamental rights"); *id.* at 41 ("[F]ee awards are essential if the Constitutional requirements and Federal statutes to which [Section 14(e) applies] are to be fully enforced."). At best, the Senate Report is in equipoise with respect to the issues presented here.

against state and local governments the value of actions properly defining the limits of constitutional enforcement authority cannot be cast aside. *See Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law" because "no legislation pursues its purposes at all costs."); *see also MetroPCS Cal., LLC v. FCC*, 644 F.3d 410, 414 (D.C. Cir. 2011) ("'The Act must do everything necessary to achieve its broad purpose' is the slogan of the enthusiast, not the analytical tool of the arbiter."). This is true even if the court is of the opinion that the best reading of the statute effects bad policy. *See TVA v. Hill*, 437 U.S. 153, 194 (1978) ("Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.").

Third, the district court thought it obvious that Congress never would have intended to allow for a party bringing a challenge to the constitutionality of the VRA to be presumptively entitled to a reasonable attorney's fee. JA 94 n.16 (finding that Congress would not have "wanted attorney's fees to be easily available to someone bringing" a constitutional challenge to the VRA and declaring Shelby County's contrary position "wishful thinking"). But that is far from obvious.

There are a number of good reasons why Congress might have encouraged Section 14(b) suits like this one.  Courts have recognized that litigants who succeed in declaring a law unconstitutional provide a benefit to the public generally, and Congress might have thought the same. *See, e.g.*, *Lavin*, 764 F.3d at 651 (stating that the public generally "benefit[s] from the redress and elimination of unconstitutional statutes and practices"); *Kulkarni v. Nyquist*, 446 F. Supp. 1274, 1277-78 (N.D.N.Y. 1977) (bringing legislation into compliance with the U.S. Constitution through litigation is an "invaluable public service").  Congress might have thought that creating a cause of action in favor of jurisdictions and incentivizing those actions with the prospect of a fee award would help to minimize the federalism burdens the VRA had imposed on the States.[13]  Or, it might simply have thought that encouraging such litigation would increase citizens' confidence in the openness of government.

In any event, Section 14(b) is hardly the only instance of Congress enacting an explicit or implicit "self-destruct" mechanism in a statute, particularly where the statute at issue is of debatable constitutionality at the time of its enactment.  *See,*

---

[13] Indeed, the fact that Congress created a cause of action in favor of jurisdictions like Shelby County to bring claims of this kind, and created exclusive jurisdiction within the District Court for the District of Columbia to entertain such claims, indicates that Congress recognized the important role cases of this kind play in keeping Congress within its proper bounds and the seriousness of the issues presented.

*e.g.*, Bipartisan Campaign Reform Act of 2002, Pub. L. No 107-155, § 403, 116 Stat. 81 (2002) (creating cause of action to "challenge the constitutionality of any provision of this Act or any amendment made by this Act" and prescribing rules for venue, intervention, and the like for such challenges); Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, § 561 (1996) (creating cause of action to "challeng[e] the constitutionality, on its face, of [Title 47] or any amendment made by this title, or any provision thereof" and prescribing that such challenge be heard by a three-judge district court); United States-Canada Free-Trade Agreement Implementation Act of 1988, Pub. L. No. 100-449, 102 Stat 1851, § 401 (1988) (creating causes of action to review the constitutionality of certain provisions of the U.S.-Canada Free Trade Agreement, with particular venue provisions); 47 U.S.C. § 555 (creating cause of action to "challeng[e] the constitutionality of section 534 or 535 of this title or any provision thereof" and prescribing that such challenge be heard by a three-judge district court); 2 U.S.C. § 922 (creating causes of action for Members of Congress to bring actions to declare orders issued pursuant to 2 U.S.C. § 904 unconstitutional); 15 U.S.C. § 720e (creating cause of action to challenge the constitutionality of the Alaska Natural Gas Pipeline chapter of Title 15).  Nor is it unusual for fees to be available to a prevailing party in such an action.  *See, e.g.*, *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012) (employee challenging constitutionality of the Civil Service Reform Act must bring action

under that act; fees available pursuant to 5 U.S.C. § 5596); *Shelter Framing Corp. v. Pension Benefit Guar. Corp.*, 705 F.2d 1502 (9th Cir. 1983), *rev'd on other grounds sub nom. Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984) (fees freely available to business that sought a declaratory judgment under ERISA that a provision of the ERISA statute was unconstitutional and prevailed on the merits); *Republic Indus., Inc. v. Teamsters Joint Council No. 83*, 718 F.2d 628, 644 (4th Cir. 1983) (same).[14]

3.   The District Court Misunderstood Shelby County's Motivations For Bringing This Action, Which Tainted Its "Purposive" Analysis.

The district court's ultimate conclusion was based largely on its assessment that Shelby County sought to "<u>oppose</u> enforcement of individual voting rights," JA 91, and that the Government and Defendant-Intervenors were "the parties charging civil rights violations and seeking to assert their civil rights," JA 94 (quotation and citation omitted). This central premise, too, was wrong.

---

[14] In any event, statutes frequently appear to run counter to the Government's own self-interest.   For example, the Federal Tort Claims Act waives sovereign immunity and makes the Government liable for damages where it otherwise would not be, the Equal Access to Justice Act and other fee-shifting provisions explicitly make the Government liable for attorney's fees where it otherwise would not be, and the Freedom of Information Act created a whole host of new burdens on Government enforceable in court and permitting an attorney's fee award.   In enacting those statutes, Congress necessarily made the determination that public policy objectives were strong enough to overcome the Government's own financial interests.

Shelby County is not an "opponent" of individual voting rights and was not seeking to defeat claims that it had violated the VRA or infringed any of the rights guaranteed by the Fourteenth or Fifteenth Amendments. Shelby County brought this litigation to restore the constitutional right of sovereign States, their political subdivisions, and ultimately their citizens, to regulate state and local elections as they see fit by vindicating the limitation of congressional power to "enforce" the Fourteenth and Fifteenth Amendments in an "appropriate" manner.  While the Government and the Defendant-Intervenors contended that preclearance enhanced voting rights, Shelby County contended—and the Supreme Court agreed—that continuing to select jurisdictions for preclearance based on the outdated formula in Section 4(b) improperly interfered with local voting prerogatives.

That Shelby County opposed this particular federal overreach does not mean that it sought to impose the voting discrimination that the VRA targeted, "opposed" individual voting rights, or objected to any other substantive safeguards of the VRA.  No reasonable person could claim, for example, that the plaintiffs in *Gonzalez v. Raich*, 545 U.S. 1 (2005), supported drug abuse and crime because they opposed federal marijuana laws, or that the defendants in *City of Boerne v. Flores*, 521 U.S. 507 (1997), opposed religious liberty because they challenged the constitutionality of the Religious Freedom Restoration Act as applied to the states. Likewise, Shelby County's objection to seeking preclearance for every voting

43

change does not mean that it stands in opposition to individual constitutional voting guarantees or the voting process rights that Congress attempted to further when it enacted and reauthorized the VRA. Shelby County's motivation was to check congressional power under the express language of the Fourteenth and Fifteenth Amendments so as to regain for its citizens the rights that the Constitution expressly reserved to it and its people (and to do the same for similarly situated jurisdictions across the country).

The district court also misconstrued the Government's and Defendant-Intervenors' positions in this litigation. Neither was "charging [Shelby County with] civil rights violations" or "seeking to vindicate individual voting rights." JA 94 (quotation and citation omitted). Rather, they presented the mirror-image of arguments that Shelby County presented—*viz.*, that Congress had acted within its authority when it reauthorized Section 5 using the coverage formula set out in Section 4(b). Section 5 might have existed to provide an additional safeguard to individual voting rights, but it created no new rights on its own, and the Government and Defendant-Intervenors were defending a <u>process</u> affecting voting rights, not any individual's "right" to preclearance. The district court therefore erred by finding that this case was the functional equivalent of an ordinary declaratory judgment action in which a prospective VRA defendant might act as a

plaintiff to ward off its potential liability to individuals whose individual voting rights were at risk.

*   *   *

In the end, the infirmity of the district court's analysis is laid bare by what it does not cite: any case in which a plaintiff sued under a statute for which fees are available, prevailed, and had its request for fees from the defendant judged under a standard other than *Piggie Park*. That absence of authority is telling. This Court should reject the district court's conclusion and hold that the district court should have exercised its discretion under the *Piggie Park* standard.

## III.   APPLICATION OF *PIGGIE PARK* MUST RESULT IN AN AWARD OF FEES TO SHELBY COUNTY.

Under *Piggie Park*, there is no doubt that Shelby County is entitled to attorney's fees. *Piggie Park* provides that a prevailing party is entitled to attorney's fees "unless special circumstances would render such an award unjust." *Piggie Park*, 390 U.S. at 402. Under this standard, "[t]he discretionary portion of the attorneys' fees inquiry is limited." *Medina Cnty.*, 683 F.2d at 438 n.2; *Zipes*, 491 U.S. at 761 (describing *Piggie Park* as a "categorical" rule that the court "*must* award fees to the prevailing plaintiff" in the absence of special circumstances). Indeed, as a prevailing plaintiff, Shelby County's "entitlement to attorneys' fees would hardly be in doubt." *Donnell*, 682 F.2d at 245.

45

Neither the Government nor Defendant-Intervenors argued below that Shelby County would not be entitled to attorney's fees under the *Piggie Park* standard, or ever contended that "special circumstances" exist here. *See* Dkts. 100, 102. These tacit concessions were appropriate. The district court recognized that "Shelby County's attorneys won an impressive victory before the U.S. Supreme Court." JA 61. And Shelby County did not merely advance a parochial interest; it vindicated a constitutional right and benefitted millions of individuals in covered jurisdictions across the country. Because Shelby County "obtained excellent results, [its] attorneys should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

## CONCLUSION

For the foregoing reasons, the district court's order should be vacated and the case remanded with the direction to declare Shelby County fee-eligible and to proceed to consideration of the "reasonable" fee amount to be awarded to Shelby County.

Respectfully submitted,

By:   /s/ Bert W. Rein
_____

Frank C. Ellis                                   Bert W. Rein*
WALLACE, ELLIS, FOWLER & HEAD      Brendan J. Morrissey
113 North Main Street                       J. Michael Connolly
Columbiana, AL 35051                       WILEY REIN LLP
TEL: (205) 669-6783                         1776 K Street, NW
                                                  Washington, DC 20006
                                                  TEL: (202) 719-7000
                                                  E-MAIL: brein@wileyrein.com

                                                  * Counsel of Record

Dated:    October 29, 2014

47

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because it contains 11,047 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: October 29, 2014          /s/ Bert W. Rein
                                 _____

                                 Bert W. Rein
                                 *Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2014, I electronically filed the original of the foregoing document with the Clerk of this Court by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: October 29, 2014            /s/ Bert W. Rein

Bert W. Rein
*Counsel for Appellant*